IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| LARRY D. CASTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:07-CV-020 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claim for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. For the reasons set forth herein, defendant's motion for summary judgment [doc. 18] will be granted, and plaintiff's motion for summary judgment [doc. 14] will be denied. The final decision of the Commissioner will be affirmed.

I.

*Procedural History*

Plaintiff filed his present application in May 2003, claiming to be disabled by "[r]ight knee trouble, very nervous, back problems," and impaired memory. [Tr. 56, 92]. He alleged an onset date of May 8, 2003. [Tr. 605]. The claim was denied initially and on

reconsideration.[1] Plaintiff then requested a hearing, which took place before an Administrative Law Judge ("ALJ") on June 6, 2005.

On July 28, 2005, the ALJ issued a decision denying benefits. He concluded that plaintiff suffers from chronic obstructive pulmonary disease ("COPD") and "a disorder of the right knee," which are "severe" impairments but not equal, individually or in concert, to any impairment listed by the Commissioner. [Tr. 20]. The ALJ found plaintiff to have a residual functional capacity ("RFC") at the light level of exertion if not exposed "to dust and respiratory irritants." [Tr. 20]. Relying on vocational expert testimony, the ALJ determined that plaintiff remains able to perform a significant number of jobs existing in the regional and national economies at both the light and sedentary levels. [Tr. 23]. Plaintiff was therefore found ineligible for SSI benefits.

Plaintiff then sought review from the Commissioner's Appeals Council. On December 1, 2006, review was denied, notwithstanding plaintiff's submission of almost 60 pages of additional medical records. [Tr. 5, 8].[2] The ALJ's ruling therefore became the

---

[1] A previous claim was filed in October 2002. [Tr. 53]. The claim was denied and apparently not appealed.

[2] Plaintiff's additional documents are discussed at length in his brief and are included in the administrative record. [Tr. 542-600]. A case can be remanded for further administrative proceedings where a claimant shows that late-submitted evidence meets each prong of the "new, material, and good cause" standard of sentence six, 42 U.S.C. § 405(g). <u>Plaintiff's veteran Social Security counsel, however, has made no effort to articulate how the present evidence warrants sentence six remand, nor is sentence six even referenced in the briefing to this court</u>. The issue is accordingly waived, and plaintiff's additional evidence has *not* been considered. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) ("Plaintiff has not only failed to make a showing of good cause, but also has failed to even cite this relevant section or argue a remand is
(continued...)

Commissioner's final decision. Through his timely complaint, plaintiff has properly brought his case before this court for review. *See* 42 U.S.C. § 405(g).

II.

*Applicable Legal Standards*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g)*; Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

An individual is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. *See* 42 U.S.C. § 1382(a). "Disability" is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical

---

[2](...continued)
appropriate."); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citation omitted).

or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof at the first four steps. *Walters*, 127 F.3d at

4

529. The burden shifts to the Commissioner at step five. *Id.*

III.

*Background and Testimony*

Plaintiff was born in 1964 and has a twelfth grade education. [Tr. 56, 69]. He is approximately six feet tall and weighs as little as 103 pounds. [Tr. 399, 455].

Plaintiff reports that his past relevant work was pushing shopping carts at a discount store [Tr. 64] for either "three or four days" [Tr. 336], "three or four months" [Tr. 340], or "one month" [Tr. 419]. Elsewhere, plaintiff told a medical source that

> he was self-employed up to about a few days before [April 2003]. He and his father used to work together doing jobs such as yard work or setting up mobile homes or buying various articles on wholesale price and selling them retail for a profit. . . . He says the reason he quit working a few days before [April 2003] was because of problems with his legs. He had pain in the leg due to a cyst.

[Tr. 349]. Plaintiff also worked as a truck driver more than twenty years ago. Regarding that job, he has told the Commissioner both that, "I dentt carrying enything [sic] they would load the truck and unload the truck all [I] did was drive" [Tr. 64] and "lot of times [I] had to load and unload my truck and lots of time [I] had too carrying [sic] stuff from the loading dock to put on the truck." [Tr. 102].

Plaintiff alleges constant and "almost unbearable" pain in his back, neck, and right knee. [Tr. 109, 112]. He further alleges that he cannot remember or concentrate due to pain, stress, and "loss of parents." [Tr. 113, 614].

5

Plaintiff has informed the Commissioner that he can perform housework including weekly mopping and mowing. [Tr. 116]. Elsewhere he has stated that, although capable, he does no housework whatsoever because a woman who the record alternatively terms a neighbor [Tr. 335, 350, 365, 611, 620], friend [Tr. 81, 91, 265, 419, 508], roommate [Tr. 134, 335, 350, 365, 419, 508], or wife [Tr. 268] "does it all." [Tr. 337, 421].[3] Plaintiff can shop, drive, and regularly attend auctions. [Tr. 110, 116, 140].

Plaintiff claims that he does not know how to write a check. [Tr. 337]. Conversely, his brother states that plaintiff can pay bills, handle a savings account, and use a checkbook. [Tr. 139].

IV.

*Relevant Medical Evidence*

On appeal, plaintiff argues only that the ALJ erred in dismissing: (1) the opinion of his treating pulmonologist; and (2) hearing testimony pertaining to weakness, fatigue, "no motivation, must be reminded of basic things, and . . . no knowledge of how to function on his own." The court's discussion will therefore focus on those issues. Other conditions will be briefly discussed only to the extent relevant.

---

[3] The neighbor/friend/roommate/wife, Nancy Salling, testified briefly at the administrative hearing. In sum, she stated that plaintiff "has like no energy level, no motivation . . . a problem breathing . . . [and] more or less at this point doesn't know how to function." [Tr. 620-21].

A. <u>Physical</u>

Plaintiff has complained of lower back pain since at least 1999. [Tr. 239]. December 1999 and November 2000 lumbar imaging was "normal." [Tr. 226, 240]. July 2003 lumbar imaging showed minimal disc bulging at L5-S1 but "no disc herniation, spinal canal stenosis or impingement of the nerve roots." [Tr. 285].

Medical sources have described plaintiff as emaciated, "appear[ing] malnourished," "very frail looking," and "so thin that his ribs are visible. [Tr. 259, 269, 367, 417]. He has "extensive tooth decay" with multiple cavities and abscesses. [Tr. 206, 260-61, 279, 314]. Admittedly, this problem interferes with plaintiff's ability to chew solid food. [Tr. 260].[4] Plaintiff also purports to have a phobia of needles because his mother had an IV placed in her arm ten minutes before her death. [Tr. 264]. Medical providers have offered, but plaintiff has seemingly not accepted, anti-anxiety medication to remedy that alleged fear. [Tr. 264, 446].

Plaintiff has a partial tear or sprain of the right ACL, along with a small cyst "at the tibial attachment of the ACL." [Tr. 287, 294]. Plaintiff told the staff of orthopaedic surgeon W.H. King, Jr. that "his knee will buckle without warning and that he has 'throbbing constant' pain. . . . 10 on a scale of 10." [Tr. 295]. Knee surgery has been recommended and was purportedly scheduled for both August and September 2003 but did not occur. [Tr. 268,

---

[4] The court takes judicial notice of the fact that many of plaintiff's symptoms are common side effects of chronic methamphetamine abuse. However, no medical source of record has opined that plaintiff in fact uses that drug.

7

294, 335].[5]

In July 2003, plaintiff asked his nurse practitioner for an "excuse that he is unable to work for his child support payments." A note was provided by the nurse practitioner, but it was "short term only" for three weeks until surgery. [Tr. 268]. In September 2003, plaintiff requested another disability "letter for court," but that request "was denied." [Tr. 265].

Dr. Samuel Breeding performed a consultative examination in September 2003. Dr. Breeding predicted that plaintiff "can lift at least 35 pounds occasionally. He can sit for six to eight hours in an eight-hour day. He can stand for two to four hours in an eight-hour day but at this time may need to sit or stand as needed for comfort." [Tr. 342]. Dr. Denise Bell then generated a Physical RFC Assessment, predicting that plaintiff could work at the medium level of exertion with limited far acuity. [Tr. 386-90]. In a second Physical RFC Assessment in June 2004, Dr. H.T. Lavely, Jr. reached identical conclusions. [Tr. 424-430].

December 2003 chest imaging showed plaintiff's lungs to be "well-inflated and clear." [Tr. 280-81]. Plaintiff first visited pulmonologist Joseph Smiddy that same month and was described as an "[e]maciated male with terrible teeth." [Tr. 399]. Dr. Smiddy

---

[5] Two weeks prior to the first purported surgery appointment, plaintiff requested and received a refill of his pain medication, which he reported "sufficiently eases his symptoms and allow him to participate in his daily activities." [Tr. 293]. Although Dr. King's records do not indicate that surgery was ever actually scheduled, plaintiff subsequently reported to a consultative examiner that "when he was at the hospital, he started having a rapid heart rate and it was decided it would be best to reschedule his surgery." [Tr. 340]. The administrative record contains no documentation to support this statement.

8

> suspect[ed] that the patient's weight loss may have impaired his immune response and he does not eat a proper diet largely because he cannot chew it with his teeth. He could have some occult sepsis from his teeth. For the present we have asked the patient to seek dental attention if possible.

[Tr. 400]. Subsequent pulmonary function testing indicated what Dr. Smiddy termed "severe pulmonary disease." [Tr. 394]. Dr. Smiddy further wrote,

> He has malnutrition. He has poor dentition and we have given him a note that he is likely to have malnutrition, lung disease and bacteremia relating to his multiple broken teeth and we are in hopes that he can get his teeth fixed which has been previously mentioned. . . .
>
> . . .
>
> . . . The patient's prognosis is quite guarded at this time and this has been explained to him but the patient still did not wish to be evaluated further here at this time.

[Tr. 394].

On February 3, 2004, Dr. Smiddy wrote a letter to plaintiff's dentist stating in material part,

> This patient has repeated pneumonia which is on the basis of bacteriemia [sic] in relation to a mouthful of broken and rotten teeth. The patient, because of his bad teeth, has associated malnutrition, weight loss, and poor immunity. . . . The patient has a severe restrictive ventilatory defect as a result of his chronic lung disease and repeated pneumonias. This patient will continue to have repeated pneumonias if his teeth are not fixed. The patient may have a fatal outcome if his teeth are not fixed. . . .
>
> It is [] my opinion a medical emergency exists for this patient to obtain proper dental care . . . . If this is not done he will have repeated hospitalizations, repeated pneumonia, and is headed for a very bad outcome and a great deal of expense in care.

[Tr. 392-93].

9

By April 2004, payment for his dental extractions had been approved by Tennessee's managed health care program. [Tr. 450]. Nonetheless, at plaintiff's next appointment with Dr. Smiddy more than seven months later, the work had still not been done. The notes of that appointment read in material part, "The patient has had COPD, pneumonia, terrible teeth, and recurrent sepsis. He was given a note to document this in regard to his need for having his teeth removed. . . . We believe that this patient should have his teeth removed for his general health, and we have provided him in-hands documentation[.]" [Tr. 391].[6]

In April 2004, plaintiff had not yet undergone knee surgery because he was "not ready" due to anxiety "over needles." [Tr. 449-50]. The following month, surgery had still not been performed (but oral surgery had purportedly been scheduled for August 2004) and plaintiff wanted his nurse practitioner to provide "a note to the Food Stamp office telling them the specific diagnosis for his knee pain, so he can continues [sic] his Food Stamps." [Tr. 449]. By August 24, 2004, plaintiff had still not undergone surgery because he was allegedly "waiting for someone to go with him." [Tr. 448]. In late September 2004, plaintiff again wanted (and received) "a note for Foods [sic] Stamps" from his nurse practitioner, and surgeries (both knee and oral) were purportedly to be scheduled for the following month. [Tr. 446].

---

[6] At the administrative hearing, the ALJ inquired as to the cause of plaintiff's weakness and emaciation. Despite the repeated (and blunt) information from Dr. Smiddy, plaintiff responded, "I don't know and they don't know. If they do, they haven't told me." [Tr. 608, 611].

10

By April 2005, there was still no surgery. The notes of Centerpointe Medical Clinic indicate that plaintiff "requested a letter . . . stating he is unable to work due to his knee & his COPD." Nurse practitioner Libby Krell wrote that, "I am not writing work excuse," and that plaintiff's request should be directed to his orthopaedist. [Tr. 502].

On June 15, 2005, citing plaintiff's pulmonary function test results, Dr. Smiddy generated a brief note that plaintiff "is 100% totally & permanently disabled by COPD & emphysema." [Tr. 531]. In July 2005, Dr. Smiddy completed a longer Pulmonary Residual Functional Capacity Questionnaire. Therein, Dr. Smiddy opined that plaintiff could "never" lift any amount of weight or engage in any postural activities such as stooping or climbing. [Tr. 535]. Sitting, standing, and walking would also be extremely limited, and plaintiff should avoid all exposure to all respiratory irritants. [Tr. 535-36]. In support of his assessment, Dr. Smiddy cited COPD and pneumonia. [Tr. 533, 536].

By his June 2005 administrative hearing, plaintiff still had not had either surgery. He explained, "I'm paranoid of needles." [Tr. 614].

### B. Mental

Senior psychological examiner Beth Ballard performed a mental status examination in August 2003. Plaintiff reported, "I shake all the time" due to anxiety. [Tr. 335]. Although he reads the newspaper for twenty minutes daily, he claimed to know neither any recent news events nor the name of any former president. [Tr. 117, 336]. Following the interview and examination, Ms. Ballard predicted that plaintiff would experience only one

"mild" vocational limitation, in the ability to understand and remember instructions. [Tr. 338].

Plaintiff underwent sporadic treatment at Holston Counseling Center between September 2003 and October 2004. At his intake interview, plaintiff reported "nerves" related to his father's recent death, along with anxiety regarding "that child support thang [sic]." [Tr. 363]. At the first counseling session, therapist Peggy Meade diagnosed anxiety disorder and possible malingering. Ms. Meade noted that "although he reports jitteriness he certainly is not jittery from observation." [Tr. 357]. Plaintiff was a "no show" at his next appointment. [Tr. 356].

Plaintiff returned to Ms. Meade on December 1, 2003, "report[ing] that he has been very sick and . . . request[ing] excuse for missing court on this date [for a child support hearing]." [Tr. 355]. Ms. Meade described plaintiff's thought content as clear and logical. [Tr. 355].

Plaintiff canceled, or was a "no show" at, three of his next four counseling sessions. [Tr. 348, 352, 354]. He did undergo a psychiatric assessment in January 2004, performed by resident Belito Arana upon referral by Ms. Meade. Plaintiff spoke clearly and coherently, his thought process was logical, his short-term memory was intact, and his recall of remote events was good. [Tr. 350].

Plaintiff saw resident Arana again in April 2004. Plaintiff reported improvement and was described as alert with logical thought process, good insight, and intact

12

cognitive functioning. [Tr. 347]. Plaintiff was "requesting a letter stating that he is too mentally ill to work [for child support purposes]" but resident Arana determined that "[i]t is hard to justify preparing such a letter, especially since the patient is improving." [Tr. 347].

Psychological examiner Ballard performed a second mental status examination in May 2004. Plaintiff again told Ms. Ballard that he shakes "all the time" due to anxiety and that he "just can't sit still." [Tr. 418]. Ms. Ballard wrote that "[a]lthough he stated several times that he shakes all the time and is unable to sit still, he did sit very still throughout this evaluation and was only noted to shake when he will hold his hand out to show this examiner that he had tremors." [Tr. 418]. Following the examination and interview, Ms. Ballard predicted limitation only as to understanding and remembering detailed instructions ("mild" limitation) and maintaining adequate hygiene ("slight" limitation). [Tr. 421-22].

At his next counseling appointment in July 2004 with Dr. Zahid Hameed, plaintiff reported increased anxiety and sleeplessness. He had an anxious affect. Thought process was goal-directed, logical, and coherent. Insight and judgment were fair. [Tr. 346]. At an October 2004 appointment, plaintiff reported improvement and Dr. Hameed's observations were similar as to thought process, insight, and judgment. [Tr. 345].

V.

*Expert Testimony*

Vocational expert Donna Bardsley ("VE") testified at plaintiff's administrative hearing. The ALJ presented a hypothetical claimant of plaintiff's height, weight, education,

and work background. The hypothetical claimant would be capable of light and sedentary work subject to the mental limitation predicted by Ms. Ballard at her first consultative examination, with no exposure to respiratory irritants or temperature extremes. [Tr. 617].

In response, the VE identified several jobs existing in the regional and national economies that the hypothetical claimant would be capable of performing. [Tr. 617-18]. The VE further testified that all employment would be precluded if plaintiff's claims of weakness or anxiety were fully credited. [Tr. 618-19].

VI.

*Analysis*

A. Dr. Smiddy

As discussed, treating pulmonologist Smiddy twice opined that plaintiff is incapable of working. Plaintiff argues that the ALJ erred in dismissing Dr. Smiddy's assessments, as the opinion of a treating physician is generally entitled to great weight when supported by sufficient clinical findings consistent with the evidence. *See, e.g., Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994). The court cannot agree, as the ALJ's rationale was well-explained and supported by substantial evidence.

The ALJ provided three reasons for dismissing Dr. Smiddy's opinion. First, to the extent that Dr. Smiddy cursorily opined that plaintiff "is 100% totally & permanently disabled by COPD & emphysema," the ALJ correctly noted [Tr. 22] that determination of ultimate issues such as disability are reserved to the Commissioner, not the physician. *See*

*Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

Next, the ALJ correctly observed [Tr. 22] that certain restrictions imposed by Dr. Smiddy grossly exceed plaintiff's admitted activity level. For example, Dr. Smiddy opined that plaintiff is virtually incapable of sitting or standing *at all*. [Tr. 535]. As the ALJ noted, "The claimant is not bedfast, as such restriction would indicate." [Tr. 22].

Lastly, and most importantly, the ALJ rejected Dr. Smiddy's opinions due to plaintiff's failure to follow prescribed treatment. [Tr. 20, 22]. "An impairment that can be remedied by treatment will not serve as a basis for a finding of disability." *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967). In support of his second, non-cursory assessment, Dr. Smiddy cited COPD, pneumonia, and ventilatory defect. [Tr. 533, 536]. However, treatment records clearly indicate that those conditions are caused by plaintiff's poor dentition. For example, Dr. Smiddy's February 3, 2004 letter establishes that

> 1. Plaintiff's "severe restrictive ventilatory defect" is "a result of his chronic lung disease and repeated pneumonias."
>
> 2. Plaintiff's repeated bouts with pneumonia are caused by "bacteriemia [sic] in relation to a mouthful of broken and rotten teeth."
>
> 3. "[B]ecause of his bad teeth, [plaintiff] has associated malnutrition, weight loss, and poor immunity."
>
> 4. Plaintiff "will continue to have repeated pneumonias [and possibly "a fatal outcome"] if his teeth are not fixed."

[Tr. 392].

15

Despite such blunt warnings, plaintiff has refused to have his rotted teeth removed, even though the surgery would be fully paid for by the state government. As justification for that decision, plaintiff cites to this court his purported fear of needles. [Doc. 15, p. 21].

A claimant who does not follow "prescribed treatment without a good reason" is not disabled. *See* 20 C.F.R. § 416.930(b). The Commissioner's regulations offer examples of "good reason" for not following prescribed treatment:

> (1) The specific medical treatment is contrary to the established teaching and tenets of your religion.
>
> (2) The prescribed treatment would be cataract surgery for one eye when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
>
> (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
>
> (4) The treatment because of its enormity (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
> (5) The treatment involves amputation of an extremity, or a major part of an extremity.

20 C.F.R. § 416.930(c). In the present case, substantial evidence supports the conclusion that plaintiff has offered no good reason for his failure to follow prescribed treatment.

Although the removal of all of one's teeth is arguably (albeit remotely) akin to an amputation, the record documents that plaintiff's teeth have, functionally, already been lost. As for the purported fear of needles, the medical sources have offered sedation and

plaintiff has refused to take advantage of that solution.

On the facts of this case, the court agrees that plaintiff has not provided "good reason" for his failure to follow potentially life-saving treatment that would remedy the conditions cited by Dr. Smiddy.

> The Social Security Act did not repeal the principle of individual responsibility. Each of us faces myriads of choices in life, and the choices we make, whether we like it or not, have consequences. If the claimant in this case chooses to drive himself to an early grave, that is his privilege – but if he is not truly disabled, he has no right to require those who pay social security taxes to help underwrite the cost of his ride.

*Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988).[7]

### B. Hearing Testimony

Next, plaintiff argues that the ALJ erred by not crediting testimony pertaining to weakness, fatigue, "no motivation, must be reminded of basic things, and . . . no knowledge of how to function on his own." Regarding weakness and fatigue, the court has already concluded that plaintiff's failure to follow prescribed treatment renders those conditions impotent as support for a finding of disability. As for the claims regarding memory, initiative, and independent functioning, such representations are inconsistent with the assessments and observations of mental health sources Ballard, Hameed, Meade, and Arana. Plaintiff's claims are further weakened by the credibility issues cited in § IV(B) of this opinion. The ALJ adequately discussed all of these considerations [Tr. 17-18, 21], and the court finds no error.

---

[7] The above discussion would apply equally to plaintiff's refusal to have his knee repaired.

C. Dr. Breeding

Lastly, plaintiff argues that the ALJ erred in considering the report of consultative examiner Breeding. Plaintiff is correct. Dr. Breeding did not sign his report [Tr. 343], and the Commissioner's regulations mandate that unsigned consultative reports may not be used to support a denial of benefits. *See* 20 C.F.R. § 416.919o(b)(1). However, the court concludes that plaintiff has waived this argument and, in the alternative, that the error was harmless.

At the administrative hearing, the ALJ asked plaintiff's counsel, "And do you have any objections to the proposed exhibits in the file?" [Tr. 605]. Counsel responded, "No, Your Honor." [Tr. 605]. Further, the issue was not raised in counsel's "letter of contention" to the Appeals Council. Counsel's superficial allegation therein of "failure to follow applicable law" [Tr. 601] is insufficient. Therefore, because plaintiff did not previously raise the issue of Dr. Breeding's signature in his administrative proceedings, the argument is waived. *See, e.g., Consolidation Coal Co. v. McMahon*, 77 F.3d 898, 904 (6th Cir. 1996).

In the alternative, the court deems the error harmless. An administrative decision should generally not be reversed and remanded where doing so would be merely "an idle and useless formality." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (citation omitted). At the same time, a reviewing court cannot find an error to be harmless solely because the claimant "appears to have had little chance of success on the merits anyway." *Id.* at 546 (citation omitted). Instead, the court must be able to discern at

least *some* indirect support for the decision, such as where proper reasoning can be inferred from the ALJ's overall discussion. *See id.* at 547-48; *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 465-66 (6th Cir. 2005).

In the present case, the ALJ's decision shows that all record evidence was considered. [Tr. 21]. Although at one point the ALJ indicated reliance on Dr. Breeding in particular, that reliance is found in the discussion of plaintiff's knee condition [Tr. 21], which is not an issue in this appeal. Further, the court notes that the ALJ actually disregarded certain aspects of Dr. Breeding's opinion as either unsupported by objective evidence or as unduly based on plaintiff's unreliable self-reporting. [Tr. 22]. Most striking is the fact that, to the extent that the ALJ relied on Dr. Breeding, that reliance was actually favorable to plaintiff. The ALJ's consideration of the unsigned report was a factor in restricting plaintiff to light and sedentary work as opposed to the higher medium level of exertion assigned by state agency consultants Bell and Lavely. [Tr. 22].

Therefore, for the reasons noted, a proper rationale can be inferred from, and is supported by, the ALJ's overall discussion of the medical record. The court finds any error to be harmless on the facts of this particular case.

### D. Conclusion

The ALJ's RFC findings were a reasonable synthesis of the objective medical evidence in this case. The substantial evidence standard of review permits that "zone of choice." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Even assuming *arguendo* that

19

a reasonable mind could have perhaps concluded differently on the ultimate issue of plaintiff's disability, that is not the standard of review binding this court. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The decision of the Commissioner was supported by substantial evidence and must be affirmed. An order consistent with this opinion will be entered.

ENTER:

                                                    s/ Leon Jordan
                                             United States District Judge